I want to remind all of you by audio today, that using a technology such as Zoom can be challenging. People may not know when others are speaking, there may be lag or technical problems. I will try to make sure that everybody can be heard properly and that all questions and answers will go through. We will take whatever time is necessary to make this happen. Just one heads up, there may be a need for a short break between the fourth and fifth cases. But that will be announced as the time approaches. Our first case for argument this morning is Marion HealthCare against Southern Illinois HealthCare. Mr. Pellora. Please, the court, counsel, health care is complicated. Financing of health care is extremely complicated. In this case, the insurance companies were the cat's paws and SIH was the cat. To sell insurance, insurance companies must have local hospitals and local health care providers, including ICU. Mr. Pellora, before we get too far into the merits, I have a question about jurisdiction. The case was finally resolved by a magistrate judge, supposedly on the party's consent. But did Blue Cross, as I will call the insurance parties in this case, did Blue Cross consent to decision by a magistrate judge? No. Isn't that a problem? I see it as a potential problem, yes. Well, every potential jurisdictional problem is a problem. It needs to be addressed. We have a purportedly final decision by a magistrate judge entered without the consent of one of the parties. Blue Cross had won summary judgment at an earlier stage, but it remained a party. And so, the question I have for you and for everyone else is whether we can do anything in this case other than dismiss the appeal and tell everyone to go back and present this issue to a district judge for decision. I think that would be a likely reasonable option at this point, given that the court, and I don't believe anybody but Your Honor, just recognized that fact. I certainly didn't, Your Honor. Well, this is the kind of thing parties are supposed to cover in their briefs. We require a jurisdictional statement to include such things as, did everybody consent to the magistrate judge's decision? I believe it was overlooked by myself, Your Honor. Well, I will be asking this same question of all three counsel. And perhaps we will need supplemental briefing from the parties. All right, Mr. Pallura, please proceed. All right. So, patients in Southern Illinois don't drive to Chicago when they're having a heart attack or having a baby, for that matter. They have to get their health care locally. And what occurred in this case is SIH used its market power, its monopoly power, to coerce seven different insurance companies to exclude a competitor, the plaintiff, from accessing patients covered by those insurance companies. They leveraged their monopoly power. And it's still going on today. Now, one of the things about this is interesting. They used inpatient services. Mr. Pallura, let me ask you one more question. Sure. You just used the word excluded. And throughout your brief, you refer to this as an exclusive dealing contract. Yes. Am I right in understanding that the insurers will pay for services at your client? Well, I think the answer to that is yes, when they can come there. But the market... That's the problem. There isn't any exclusive dealing. Your client can get reimbursed by all of these insurers. What we are looking at is price discrimination. Your client will get less than other members of a preferred provider organization. So why is a price discrimination being addressed as if it were exclusive dealing? Well, the exclusive dealing nature of the contract and the cost shifting that was shifted to patients as a result of the exclusive dealing caused patients covered by the insurance companies to migrate from our particular facility. Counsel, you're not getting my question. You have agreed that the insurers will indeed reimburse services at your client. Your client's problem is that the reimbursement is at a different rate than the reimbursement in preferred provider organizations, in network organizations. My question is, why should we think of price discrimination, which this is, as exclusive dealing? Well, I think that one could argue that it is price discrimination. I think most of the cases that I'm aware of in the Seventh Circuit treat these types of cases as exclusive dealings, when in fact many of them are or could be construed as price discrimination. Meaning, in some cases, if a patient wants to go to us, there is no insurance coverage the patient has to pay the entire bill. But if they go someplace else, they don't have to do that. But I think it's in both situations, it's both an exclusive dealing and a price discrimination argument. I don't think they're both mutually exclusive. That being said, I think what the lower court missed in this particular case were the market realities of how healthcare is reimbursed and what those exclusive contracts did to the patient's choice moving them from Marion Healthcare. In 2008, they did over 580 cases, I believe, covered by Blue Cross, until they went down in the 50 range in 2015. And that was clearly, as the market changed, starting in about 2007, insurance companies became very savvy to try to push patients only to in-network providers. And they put cost differentials, they made different payments based on where you had the procedure done, regardless of whether it was the same procedure. So they used the changing market scheme to try to push patients where they wanted to go. Mr. Pleros, it's Judge Scudder from the courtroom. One of the questions I have in preparing for today is, where in the record have you shown antitrust injury that's caused by what you allege to be exclusive dealing? I don't see evidence of it. I mean, I understand your argument, but what's the evidence of it? The evidence is in our expert report at paragraph 160, 161, and 162. Which expert? The one that was excluded? Dr. Bulbus, yes. Okay. Yes, and we believe it's an error to have excluded him. So if you will look at paragraph 160, 161, and 162 of Dr. Bulbus' report, you'll see the injuries suffered. You'll also see the drastic drop. For example, in defendant's exhibit 79, you'll see how our patient encounters dropped from 580 in 2008 to 515 in 2009. These are patients covered by Blue Cross. To 377 in 2010, to 138 in 2011, and to 46 in 2015. But the district court concluded that the reason, or the primary reason that the record showed for that occurring, was because Marion Healthcare chose to remain out of network. Let me address that because that's a very important issue. SIH never once, not one time in any of their motions for summary judgment, brought that up. Never one time. Doesn't exist. And what the court did is swasp on, develop that theory. And we argue they should have given us a chance to respond to it. And black letter law says we had the right to respond to it. You can look until you're blue in the face, and you will never find that argument in SIH's brief. But if we assume that somehow you can read between the lines and find that particular argument, that requires you to ignore all the other evidence that exists in the record where Marion Healthcare attempted on numerous occasions to get a contract. You need only look at document 313-85. That's the email where Marion Healthcare reached out to Blue Cross, and Blue Cross representative Brenda Lane says, we'd love to have a contract with you, but we have an exclusive contract. And therefore, we recommend you go ahead and call your competitor, SIH, and see if they'll waive that. Which, if you go then down to docket 314-1 at page 90 footnote 269, we did exactly that. We swallowed our pride, and we got on the phone, and we said, SIH, our competitor, will you waive that? And they said, no, we won't. And so to come up with this theory, you're going to have to ignore significant and substantial evidence in the record that shows we reached out. The other thing that you're going to have to do is you're going to have to ignore one of the things. And the error in this case was the magistrate and then the magistrate judge and the special magistrate just plain missed things. If you look at the health alliance issue where the report and recommendation says equally important is the causation analysis is the fact that MHC made no additional attempts to negotiate with the health alliance after 2011. And the court said, the lack of any attempt speaks volumes. Wait a minute. Wait a minute. What's going on is the magistrate and then the district court is then saying, I'm going to take that inference and assume it against the non-moving, and you can't do that. But more importantly on that incorrect fact is, in fact, at the very page where the judge cited to it exists, where the question at page 94 of the deposition, that's document 314-7 at 24, where, in fact, that's wrong. His statement that Marion Healthcare never reached out to the health alliance after the letter October 19, 2011, when they asked in the deposition, and that's in the record, the health alliance representatives answered, you know, questions. Since the time of this letter has Marion Healthcare reached out to health alliance regarding a participating provider contract? Answer, yes. But the court missed it. The court said it never happened, and I am going to infer that that speaks volumes, that you didn't do it. Well, the problem was, first, the court shouldn't be making any inferences, but let alone an inference that is based on false facts, which is clearly the case. I'll give you another example. In some ways, I wonder if the court really, well, there were some mistakes made. I'll call attention to the court's opinion stating, in addition, Dr. Boatles testified that Marion Healthcare suffered damages as a result of SIH's exclusive contracts with HealthLink that were ongoing throughout this time period. That's document 451 at 9, appendix A56. Well, the only problem with that is all parties agree. HealthLink never was part of any exclusive, yet the court somehow, the court said the district court's opinion is under some misunderstanding that somehow SIH had an exclusive with HealthLink. Now, what they did have was SIH tried to get an exclusive, but they could never get HealthLink to bite on that. They would have had eight exclusive contracts locked up. But my point is, is the court is coming up with all of these determinations based on incorrect inferences, inferences that it should not make or under the summary judgment standard. And that's where we're talking about Massachusetts, where the court misapplied the principles. The district court and the magistrate is not allowed to sit as a trier of fact in this case. They can't do that. They got to assume all inferences in our favor, in the non-movement's favor. Mr. Poira, let me ask you one other. Is our decision in Methodist Health Services correct in your view? Yes, absolutely correct. And what, I'll tell you another thing. In that particular complaint, the attorneys called me to find out, and they basically copied our complaint. But I'll tell you why that decision is correct, Your Honor. Because you had two parties equally suited, meaning one hospital, OSF St. Francis, where I worked, and one hospital, Methodist, where I worked. And both of them were on equal footing. And so they each had an opportunity to vie for the contract, to compete for the contract. We had no, the surgery center plaintiff in this case, has no opportunity to compete. None. Zero. Because one of the differences between our case and why Methodist lost is because they chose not to offer the extra services. They chose not to invest in ICU beds or pediatric neurosurgery or whatever. Marion is in a different situation. The realities are you've got a big monopolist in a small surgery center that only offers one service, and that's outpatient surgery. We don't, Marion doesn't have the ability to compete for inpatient services. And that really was the coercion that was used against the insurance companies in this case. Meaning if you want to sell an insurance product in Southern Illinois, you've got to have an ICU bed. You've got to have an obstetrical unit. And everything in the record makes it very clear that if you don't give us this exclusive, you're not getting a contract with us for those services. And it was a gun to the head. But it was a gun to the head. But at the same time, once they accepted it, they were all in. They were in for a penny, in for a pound. And they would not go back on it. But to get back to this argument of somehow it was an out-of-network strategy, I want you to just think about this for a second. The district court came up with this theory, which SIH never advanced it. Or it was their strategy. That would assume the illogical reference that Marion is just going to pursue a illogical strategy until it has no insurance patients at all, which is unbelievable. What the district court and nobody has answered, certainly not SIH, and I'd like them to answer this question is, well, if the strategy was not to sign up with any insurance companies, how do you explain that Marion HealthCare twice signed up with HealthLink? And I think it's important for this court to understand what is HealthLink. HealthLink is not a single insurance company. HealthLink is a network of insurance companies. So when HealthLink and Marion HealthCare, the plaintiffs, sign an agreement, they're really, Marion is really signing an agreement with many, many insurance companies. So that shoots this argument of, well, it was their strategy. In fact, when they signed the first contract in 2011, they were so desperate because they had no way to get any patients. They were held hostage, and they said, just sign anything, which they did. And they promptly lost a whole bunch of money, and they had to get out of that. And they said, we can't do this contract. But later on, they signed a second contract, and they're in that contract today. But the Blue Cross exclusive contract exists to this day. It bars any new entrance to the market from getting a contract with Blue Cross without their permission. It exists right to this day. And it's impossible to think that if this scenario, where we reach out multiple times, we sign a contract with HealthLink, we sign, we try to get contracts, and you can't get one, and a monopolist can keep you out, then there can be no situation where a small pre-standing surgery center can compete, because there will always be the situation where they can keep you out. I want to just bring up a couple points here. I believe they accused us of saying that Matsushita didn't apply. Matsushita applies, clearly. What we try to say is what the court did, the lower court, and the special magistrate, is they stepped out of the tenets or the guidelines of Matsushita, and they assessed the credibility of witnesses. They chose between competing reasonable inferences. They put blinders on. I mean, the court doesn't even assess. The biggest issue here is the court said, well, that was your strategy. Well, that's nonsense, notwithstanding the fact that SIHE never even made that argument. But we tried to supplement. The court didn't allow the supplement, but even without all the supplemental information that's in the record that we tried to get in, which we think is an error, if you look at what is clearly in the record, I mean, what about the fact that we signed two different contracts with Health Alliance? We made multiple attempts to sign. What they're really trying to do, and I'm going to say, well, you didn't sign up with Blue Cross back in 2004 before the relevant period, and you caused your own damages. Wait a minute. Wait a minute. I'm not talking about 2004. I'm not talking about 2004 at all. I'll tell you another error the court makes. They're talking about, well, you turned down a contract in 2015 with Blue Cross. I ask you, where is that contract? Dollars to donuts. It did not occur. There's an email where the parties are negotiating. What everybody learned was the non-compete was still in place. It was a charade that they did to try to make it appearance that we're going to give you a contract when, in fact, the non-compete is still in place. But if, as the court suggests, that we turned down a contract or Marion turned down a contract in 2015, where is it? Point to the record where Marion turned down any contract because it didn't occur. So what the court has done is the court has said, well, I'm going to look at 2004. You didn't have a contract then. There was no need for a contract in 2004 because the market was different. We're talking about the relevant time period from 2008 to 2015. That's the relevant time period. But as the market changed, the strategy of the business changed. But what the court has done is they look at periods outside the relevant time period in 2004, and they look at a negotiation in 2015, and then makes the leap that I'm going to use that and infer that that means they would never have contracted with Blue Cross or Blue Shield and that their strategy was out of network. And it's an unreasonable inference. It's an inference that's not allowed under the summary judgment standards, and it's wholly based on inaccurate data. I want to look at a couple notes. We have ad nauseum gone over why the court made errors in its exclusion of the expert witness, our expert, John Bobos. And they're criticizing Dr. Bobos's methodology. Well, the methodology is the result of there is one single competitor in the market that's a surgery center, and that is owned by PSC. That's owned by SIH. That's PSC. Further complicating it is the overlap in procedures is only 25% to 35%. And what that means is Bobos used the only reasonable option is they looked at PSC's contract with HealthLink that wasn't exclusive, and he made extrapolations. But the real problem is if SIH wants to say that's no good, then what they're obligated to do is come up with a valid methodology that is an alternative that he should have done, and that they did not do. That's why you can't exclude Dr. Bobos. Thank you. Thank you, Mr. Pallure. Your time has expired. Mr. D. Yes, Your Honor. This is Terry D. on behalf of Southern Illinois Healthcare, and I'm appearing by phone, so we had some technical difficulties this morning. So I don't have access to the timer, but I'll try and keep it to as best I can to be seen. I'd like to first address. I will let you know when two minutes are left. Great. Thank you, Your Honor. I'd like to address Your Honor's question first on jurisdiction. The procedural history of the case is that after Judge Yandel dismissed Blue Cross Blue Shield with prejudice, Marion Healthcare filed its third amended complaint. The third amended complaint did not list Blue Cross Blue Shield as a party. It was not in the caption, not identified in the allegations as a party. So at that point, Blue Cross Blue Shield was not a party, and under 28 U.S.C. 636. Well, then why is it a party on appeal? Well, it's a party on appeal because of. The argument is that a plaintiff dismissed it as a party, then it wouldn't have to consent to the magistrate judge, but it couldn't be the subject of an appeal. If it is a party on appeal, then it was party in the district court. It was a party. It is a party on appeal because it was dismissed on a motion to dismiss. And the order was entered. Final judgment against in favor of Blue Cross Blue Shield as part of the order that also dismissed Marion Healthcare. And so, but that's just a ministerial act of the clerk. You don't need a court to do that, but for purposes of what magistrate we used to resolve the complaint. When a party wins summary judgment, it doesn't cease to be a party. It is still a party to the lawsuit. It is just prevailed in the district court. The reason it is a party on appeal is that it's been a party to this lawsuit all along. And that's the cause of the jurisdictional problem. Blue Cross was a party which never consented to have anything done by the magistrate judge. Your Honor, the parties consented to the magistrate to resolve the third amended complaint within which Blue Cross Blue Shield was not a party. And so in that context, counsel, I will be asking for supplemental briefs, but if your position depends on the proposition that somebody who wins summary judgment ceases to be a party in the case, I think we're in deep trouble here. Your Honor, it's not our position that Blue Cross Blue Shield seems to be a party after summary judgment was after a motion to dismiss where it was earlier in the case before summary judgment. And at that point, then there was a third amendment complaint. We'll address that. Exactly the same. If you move for dismissal under rule 12, B six and you win, you are still a party to the litigation. You don't cease to be a party by defeating your opponent's claim. That's the source of the problem I am having. Okay, your Honor, I guess we can address that. And if the court's going to order supplemental briefing on that, we can address that. Our position is that for purposes of resolving third amended complaint, that Blue Cross Blue Shield as a practical matter was not a party and did not and could not have consented to that at that time. But we'll address that in supplemental briefing. In terms of, I'd like to turn, I guess, to the merits of the case. And I'm going to start with the merits of this case.  First. I think while the claims in this case are based on, and I trust law, the decision below in this appeal involved fundamental evidentiary issues, common to nearly all civil tort disputes. And that is evidence of causation, injury and damage. And both the special master and the district court. Reviewing the record DeNovo evaluated MHC evidentiary record. And held that MHC failed to support causation injury or damages because in the words of the district court, they, the court would have to engage in pure speculation to find sufficient evidence of antitrust injury causation or damages. And our position is the court should affirm the district court's entry of summary judgment for SIH on all three or for any one of those failures of evidentiary proof. And I'd like to turn on the merits first to judge Scudder's question related to causation and the trial court properly held that MHC failed to present evidence that, but for SIH's contracts with payers would have had a network contracts with those payers. Now, as a first matter, Dr. Flora says, Mr. Flora says that we did not present this summary judgment. That is in their briefing. That's not true. The district court outlines in detail as a special master, the areas in our briefing where we addressed causation. And in any event, it's not particularly relevant at the court of appeals level where the court is going to review causation. And we can affirm on any matter present in the record and lack of causation is present in the record. So it is undisputed. And this is in the uncontested facts that the special master laid out that neither party objected to. They had the opportunity to object and didn't object. But in those uncontested facts, MHC had an out of network strategy until at least 2010. That's in the separate, separate appendix. And it's uncontested that MHC. You're out during the period of this dispute rejected contracts with payers because they didn't like reimbursement rates. So MHC proceeded on this out of network basis and rejected in network rates because it saw more profit in staying out of network. And that was their preferred business model. When, if you look at the three relevant payers, it's clear. There's no way there's no evidence that had, but for the exclusive contracts, they would have, MHC would have entered into in network contracts with these payers health link that Mr. Fleur identified is, is one of the key examples. There was no restriction restriction on contracting with health link. At any time in this case, from, from the inception of MHC to today. And it wasn't until 2012. That MHC even considered going in network with health link. In fact, in 2008, the record shows it. Health link proposed rates of proposing in network arrangement with. MHC and MHC rejected that contract because of low reimbursement rates. And then even when they entered into the contract in 2012, they terminated the contract because it wasn't profitable for them to be in network because of the low reimbursement rate. So it wasn't until 2015. With the one pair in which there was no exclusive contract that MHC actually entered into an in network contract. So on that record, you can't say that, but for a exclusive contract at any point between 2004 and 2015, MHC would have gone in network health alliance is another example. That was, there was no restriction, no exclusive contract between SIH and health alliance between 2004 and 2007. And at any time after 2010, yet at no time during that period, did MHC enter into a contract with health alliance. Now MHC tries to say there was some constructive agreement between health alliance and SIH after 2010, but there simply is no evidence of that. And the district court and the special master both agreed that, and it's part of the uncontested facts that, that there is no evidence that, that health alliance didn't contract with MHC because of any constructive agreement with SIH. There's just no evidence of it. And in fact, there's only affirmative evidence from health alliances witness that there was nothing, no agreement with SIH that prevented MHC from contracting with them after 2010. Then finally blue cross blue shield between 2004 and 2007, there was no exclusive agreement yet during that time, MHC never contracted in network with, with blue cross blue shield. And then it isn't until 2015, actually MHC does get into negotiations with blue cross blue shield and blue cross blue shield. And this is again, part of the uncontested facts offered on above market reimbursement rate to MHC and MHC rejected that because it wasn't good enough, even though as the district court and special master found the blue cross blue shield proposal was equal or more generous than that offered to other surgery centers in the area. Mr. Yes, it's a judge Scudder. Can you, can you address the point that Mr. Player made with respect to antitrust injury and damage by relying upon those few paragraphs and the facts or evidence in the few paragraphs and Dr. Bobliss is expert report. Yeah, I will. I guess your honor, I will address antitrust harm. I, the paragraphs and the argument that Dr. Fleur made seemed to rely on harm that was caused to MHC because of decreased patient volumes during a particular period of time after 2009, 2010. And that's not harmed MHC is not antitrust harm. That is a different type of injury. It conflates the two of antitrust injury and harm. And, um, standing and, um, we need in order to prove harm to competition and antitrust injury, MHC has to put forth evidence with a fair degree of certainty that there was, uh, an ink, there were increased healthcare costs or a decrease in the availability or quality of healthcare. And that just doesn't exist in, in this record. Um, as an initial matter, you know, just in terms of antitrust injury, MHC waived or forfeited. It's challenged that this is positive ruling because it didn't address it in its opening brief. Nowhere is this argument about antitrust harm included in its opening brief. And therefore, uh, and to the extent that this is, this constitutes a forfeiture, there's been no showing of plain air or good cause. So whether it's called waiver or forfeiture, the court can affirm on this ground alone, but second, um, the argument that there are higher prices, um, well, it's, it's argument at the court below with, if there was, there were higher prices in the Southern Illinois market compared to all other markets in Illinois. And as a special master and judge Beatty found that there, there is no analysis of different prices existing in different markets. So there's just not any support in the record for that. And, and apparently MHC has abandoned that theory of harm, um, because it wasn't raised in their opening brief or in their reply brief. Now in its, in their reply brief, uh, MHC argues that insurers and patients pay higher price. And the theory is that patients went to, which couldn't go to MHC, but therefore they'd have to have to have the procedures done at a hospital. So, uh, where prices are higher. Now it's important to understand, um, that hospitals are always going to have higher prices than surgery centers because they have a much higher, much higher cost structure. They're open 24 hours. They have emergency services, et cetera. So there's no dispute as the district court and special master found that hospitals are going to be more expensive. The problem is, is that there are other options for patients besides going to a hospital. Under the uncontested facts, there are four other ambulatory surgery centers that patients could have gone to other than marrying healthcare. And so in order to understand properly, whether prices went up or down, the apples to apples comparison is not surgery center to hospital. It's surgery center to surgery center. And the, the record reflects in that. And there's no evidence from MHC to the contrary, that the, uh, surgery centers are affiliated with Southern Illinois healthcare, which is physician surgery centers is one example that vision surgery center was less expensive than MHC. That, that was Dr. Bobliss admitted that. And, um, uh, SHS expert, Dr. McCarthy admitted that. And even when he compared hospitals to hospitals, that's age hospitals were the cheapest, uh, in the seven County area of Southern Illinois, um, in a comparison. So there's just no evidence of any increase in prices. And the other thing that, that hurts MHC here is there in the reply, Dr. Plura or Mr. Plura says, or an MHC says that for determining call, uh, factor, this is on page 23 is the cost to the patient. And if you're looking at the cost of the patient, Dr. Bobliss admitted, there's a multi-factor test. It included the bill, how much the procedure costs. What are the discounts that are in the contract between the insurer and the, um, uh, provider. And then what is the cost sharing between the patient and the insurer in terms of deductibles and copays? Um, he admitted that's what you have to look at to look at cost to the patient. And he admitted Dr. Bobliss is at his deposition that he had did no analysis of those factors. So MHC has no evidence. Uh, patients. You have two minutes for me. Thank you, your honor. So, and I guess the last point on the answer, I just got his question and harmed competition. There is no evidence. Of any impact on quality or availability of service that trial court uncontested facts again, which needs a party challenge said there's no, absolutely no evidence in the record. Tending to show any relationship between the quality of care. At southern Illinois hospital. So with respect to, uh, I think I'll cover damages quickly, but there there's no dispute. That's trial court applied the proper rule seven or two tests. Uh, so the really, the only question is, did the court abuse discretion in, um, striking Dr. Bobliss his opinion and. The court exercises discretion properly. And the real key here is that it's a difference between. Dr. The plaintiff's theory, MHC theory, that, um, of liability, which is that. SIH contracts with payers excluded MHC from in network contracts, those payers. And then Dr. Bobliss is applying a yardstick methodology where his, but for world. It's not based on MHC being in network, but it's based on MHC remaining out of network. It's so the opinion is completely divorced from the. Theory of liability and therefore should be, um, Discussed in the background alone. I may see, seems to say that the court shouldn't have looked at how Mr. Dr. Bobliss applied the yardstick methodology on page 10 of its reply. Uh, saying that whether plaintiff has met the burden of showing comparability or nearly as a question for the trier fact, but. But in support of that, it may see sites for cases. Which all are pre 1996 cases, which is when the Supreme court. If you. It's Dover to pencil your, your time is expired. Thank you very much. Thank you. Mr. Much. Uh, may it please the court Jim much neck for healthcare service corporation. I'm prepared to address the antitrust substance. If the judges would desire. I'm also. Prepared to offer some supplemental thoughts. Um, Uh, in addition to those made by Mr. D on jurisdiction. And I'm happy to start there since that seems to be the courts. Primary interests. Which is whether we're. Oh, please, please do start there because. Appellate jurisdiction is the first issue in every appeal. Of course. So, uh, as our jurisdictional statement makes clear under rule 58. It was appropriate for the case to move forward on appeal. Cause all claims for relief had been denied. The court is worried about the issue of consent of the parties under six, three, six. I'll only note. In addition to what Mr. D said that docket number 90. Says we were dismissed with prejudice. Marion did file a third amended complaint, Not naming. Blue cross as a party. It was not served party on appeal. If your view is. That blue cross ceased to be a party. When the third amended complaint was filed. You shouldn't be here. But evidently you believe you're a party. For the purpose of the appeal, which is a rule 58.  I don't think that's an appropriate, uh, matter. We think we're an appropriate party for that issue. Then more narrow questions. Counsel. That's because you were. And always have been. A party to this case. That is the problem under six 36 C. All the parties to the case have to consent to decision by the magistrate judge. Or there can't be a direct appeal. The decision of the magistrate judge has to be reviewed first by the district court. That's. I think. I mean, everybody needs to see that that's the problem. The court could also take into account when judging this, we're happy to supplement this as you suggest. As to whether or not blue cross impliedly consented to the work by the magistrate judge. The court. Such concept. The consent has to be expressed. We voluntarily submitted to the courts. Um, magistrates review. By moving the court for relief. To receive a protective order as a non-party. Um, later in the matter. Also could take a look at the courts case and Coleman. And what is the appropriate context for an appeal? That case, the court was worried that a named party. Had not consented. Here you could look at. Because that litigant hadn't even been served. Right. We, we held in Coleman. Rightly or wrongly. And if you know Coleman, you will know that I dissented from the denial of rehearing on bunk. But the holding of Coleman. Was that even a litigant, a named litigant who had never been served. Was a party for the purpose of six 36 C. I read your dissent and, and the main thing is the issue is one of context. And there was an issue of formality as well. Under Coleman, it was a named party in the complaint. That was then moved for. Relief by the magistrate judge. In our circumstance, we are not a named party. At the time that case moved forward. Oh, come on. Certainly you were a named party. You were named in the complaint. You didn't cease to be a party. You don't tell us that you think you are not a party in this litigation. Right. People don't become parties and then on parties and then parties again. I think we're prepared to offer additional thoughts and supplemental briefing. I think that's important to recognize rule 58 and six 36 might have different. Procedural postures with respect to consent versus an appellate. Appropriate. Standing for a lack of a better term. We see the issue. That's why this is judge. Can you. How can you not or do or not consent? You either consider you don't. Our view was we were not required to consent. But in the context of. As a, as a non party.  I don't think we should have a non party. But the court, because this is effectively a. A ministerial issue. Could take into account, whether it's implied consent. Or the standard taking in totality. Whether it is appropriate to return us. And then come back to you a couple months later. Thank you. I'm also prepared to address the substance of any antitrust issue. I think it's all only note. For the minute that we have left that. The appellant uses the term in this argument gun to the head. Which is the opposite of buyer liability.  Whether it's a non party. Under the Sherman act or the Clayton act. And whether the issue is. Exclusive dealing or price discrimination. The cork antitrust concept is one of market power. And buyers don't have market power. Mr. Much Nick. Has there ever been an argument in this case that the blues are monopsonists. In the. In the complaint, it identifies that. It argues that blue cross had market power. But in a different market. In which both SIH and MHC compete. Unless the court has anything else. I have nothing further. You're. Well, thank you very much council. The court. Okay. Request the parties to file supplemental briefs about jurisdiction. Within 14 days. Those briefs should discuss the effect of Coleman. Against the labor and industrial review commission. Eight 60 fed third. Four 61. And any related decisions in other circuits. Or how they may bear on this question. And when those memos have been received, the case will be taken under advisement.